IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 11, 2005 Session

**STATE OF TENNESSEE v. MARK S. ARMSTRONG**

**Direct Appeal from the Circuit Court for Rutherford County
No. F-53628     James K. Clayton, Jr., Judge**

-----

**No. M2004-02432-CCA-R3-CD - Filed July 22, 2005**

-----

A Rutherford County jury convicted the Defendant, Mark S. Armstrong, of aggravated rape, and the trial court sentenced the Defendant to twenty years, as a Range I offender. On appeal, the Defendant contends that: (1) the trial court erred when it failed to grant the Defendant's motion for a mistrial when inadmissible evidence was admitted through an inadequate redaction of a videotaped statement; (2) the trial court erred in failing to provide an adequate limiting instruction to the jury regarding a videotape sound malfunction; (3) the trial court erred when it failed to require the State to make an election of the offense for which it sought a conviction; (4) the trial court erred in failing to grant the Defendant's motion for judgment of acquittal; and (5) the evidence is insufficient to sustain the Defendant's conviction. Finding no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

John C. Mitchell (at trial), and Allen D. Hale (on appeal), Murfreesboro, Tennessee, for the appellant, Mark S. Armstrong.

Paul G. Summers, Attorney General and Reporter; Preston Shipp, Assistant Attorney General; William C. Whitesell, Jr., District Attorney General; and Laurel A. Nutt, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts at Trial**

In February 2003, the Rutherford County Grand Jury indicted the Defendant for aggravated rape. On January 27 and 28, 2004, at the Defendant's jury trial, the following evidence was

presented: A.M.,[1] the victim, testified that she was thirteen years old in August of 2002. She recalled that, on August 6, 2002, she lived down the street from the Defendant. She said that she was friends with the Defendant's wife, Susan Armstrong, and his children, and she and her siblings often played at the Defendant's house. She said that, on August 6, she told her sister, that she was going to the Defendant's house to get a skirt from his wife. A.M. recalled that her younger brother was at the Defendant's house playing with the Defendant's son.

She said that she went to the Defendant's house, and, after no one answered the front door, she walked around to the garage and saw the Defendant. She said that she asked the Defendant if his wife was at home, and he informed her that she was not. She asked the Defendant if she could go into the house to retrieve a skirt that she had lent to his wife, and he told her that was fine. A.M. said that she went into the house and walked upstairs, and she could hear the television in the playroom downstairs where her brother was playing. She testified that, as she reached the top of the stairs, she felt the Defendant "touching [her] butt. And that's when he picked [her] up, and he set [her] on [his] bed." A.M. recalled that the Defendant lifted her shirt and began touching her chest underneath her bra. She said that the Defendant then removed his clothes and fully removed all of her clothes. She testified that the Defendant digitally penetrated her, and, "It hurt." She said that the Defendant then penetrated her with his penis, and, "It hurt." She recalled that she said "ow," but she did not scream or call out for help because she was afraid. She explained that she thought, "if he did what he did in the first place, [she] was afraid he would do something else if [she] tried to call for help." A.M. recalled that the Defendant was "moving up and down" and "breathing hard." She recalled that after he stopped, she "rolled out from under him," got dressed, and quickly left the house, taking with her the skirt she had come to retrieve. She said that there was "wet stuff" on the bed, and the Defendant tried to wipe it off with his hand. A.M. testified that she did not see anyone when she was leaving the Defendant's house.

A.M. testified that she went to her house, and she told her sister that she was going next door to see their neighbor, Shera Allen. She recalled that, before she went to Allen's house, she called the Defendant and told him that she was going to "tell on him" and that she "might be pregnant," and the Defendant responded, "no" both times. She said that she was crying and scared as she told Allen about the events at the Defendant's house, and she asked Allen to tell the victim's sister what happened. Allen walked with A.M. to A.M.'s house, and A.M. sat with Allen while she talked to A.M.'s sister. A.M. said that she then called her stepmother at work to tell her what had happened, and she thought her stepmother called the police, because the police came to her house shortly after she spoke to her stepmother, and her father came home around this time as well. A.M. said that the police came to her house and questioned her about the events at the Defendant's house. She said that they collected the clothes that she had been wearing, and then they put her in an ambulance, which drove her to the "doctor and [to] get checked."

On cross-examination, A.M. testified that she did not know that the Defendant had followed her into the house until she was in his bedroom, and he had begun touching her. She said that he

[1] It is the policy of this Court to refer to the victims of sexual assault by their initials only.

entered the bedroom and closed the door. She said that the Defendant did not speak to her during the incident, and he did not speak to her while she got dressed after the incident. She remembered giving the police a statement, but she was not aware that the interview was recorded. On redirect-examination, A.M. reiterated that she was afraid to scream for help, and she explained that she was also frightened because the Defendant's facial expression during the incident, "was all mean looking . . . . Like his eyebrows were all down . . . [and] he was breathing hard . . . ."

Detective Mark Warf, an investigator with the Rutherford County Sheriff's Department, testified that he has been with the sheriff's department for nineteen years. Detective Warf recalled that, when he arrived on the scene of the incident, A.M. was upset and crying in the back of the ambulance. He said that he interviewed A.M. at the scene and again on a different day. He recalled that he spoke to the Defendant briefly at his home, and the Defendant came voluntarily to the police station to give a statement. He said that he collected the comforter, cover sheet, and fitted sheet from the Defendant's bed as evidence, and he sent these items to the Tennessee Bureau of Investigation ("TBI") crime lab for analysis and testing. The detective said that the Defendant gave both a written statement and a videotaped statement. The Defendant's videotaped statement was played for the jury. In his videotaped statement, the Defendant denied any sexual contact with A.M., and he referred to her as "a hot thirteen year old kid." Detective Warf further testified that, with a search warrant, he obtained a sample of the Defendant's blood for analysis and testing.

Detective Warf read the Defendant's written statement, stating:

Tuesday, August 6th, 2002. [A.M.] came over around maybe 2 pm or so, I was in the garage on the phone, and she said she needed to talk to her brother who was in the house with my son. I told her that he was in the house, and she went on in like always.

Then in maybe five to ten min[utes], she came back to the doorway and said something about a skirt. I was still on the phone with Alexander Ford parts dep[artment], and I told her I did not know nothing about it. She said that my wife Susan had told her where it was, and I told her it would be ok[ay] for her to go upstairs and look.

I was never in the house the whole time she was there. She came back out in a few min[utes] with a skirt and said by[e]. I said see y[ou]. To add this, her sister called and ask[ed] if my daughter could play and I told [her] she was sleeping. [T]his is while she is looking for her skirt.

The Detective said that, along with the items he collected from the Defendant's home and the Defendant's blood, he also sent A.M.'s rape kit, and the shorts, shirt, bra, and underwear that she was wearing at the time of the incident to the TBI crime lab.

On cross-examination, the detective testified that, when he first went to the Defendant's

3

house, the Defendant was cooperative and gave the detective consent to search his home. Detective Warf recalled that the Defendant voluntarily met the detective at the police station for questioning, immediately after the detective requested. He said that he formed his opinion that the Defendant had raped A.M. during his interview with the Defendant, because the Defendant was "rubbing his head, and it looked like he was having maybe some second thoughts," and he said that he decided to charge the defendant when he received a report from "Our Kids" clinic that A.M.'s physical examination supported her allegations of rape. The detective admitted that the Defendant said he had a migraine around the same time he began rubbing his head. Detective Warf said that, when he interviewed A.M. on August 6, he did not take notes. He did not recall whether A.M. told him that she took a shower after the incident, and he explained that the initial incident report was filed by Deputy David Crim, the first officer to arrive on the scene of the incident. He testified that he filed a supplemental report. He acknowledged that he reported that A.M. was upset when he interviewed her and that she was "concerned that her parents were going to be upset with her."

Hunter Greene testified that he works for the TBI crime lab in the serology and deoxyribonucleic acid ("DNA") analysis section. Greene said that he received eleven items of evidence to process for this case: A.M.'s blood sample; a vaginal swab from A.M.'s rape kit; A.M.'s panties; the Defendant's blood sample; A.M.'s shorts; A.M.'s shirt; A.M.'s bra; and the Defendant's bedding, including pillowcases, a flat and a fitted sheet, and a comforter. Greene testified that he found semen, but not spermatozoa, on the panties, and he explained that he was unable to obtain a DNA profile because the DNA sample was degraded and insufficient in amount. He testified that semen was only located in one area on the bottom bed sheet, at one end of the sheet over to one side. He said that his tests revealed semen, but not spermatozoa, on the bottom bed sheet, and the sample was a mixture of DNA from three different individuals. He explained that he positively identified the Defendant as one of the three contributors. He further explained that he could not positively identify A.M. as a contributor, but he could not exclude her either. Greene testified that his examination did not reveal semen or spermatozoa on the vaginal swab, and he said that he would not expect semen to be found on the vaginal swab if the ejaculation occurred outside of the female's body. He affirmed that the presence of semen inside her underwear, but not inside her vagina, could occur if the ejaculation occurred during the male's removal from the female.

On cross-examination, Greene reiterated that he found semen, but not spermatozoa, on the bed sheet. He explained that many factors could cause sperm to be absent from semen, including a male's low sperm count and environmental or bacterial degradation. He said that degradation could occur within days or take a few weeks, depending on the environmental conditions. Greene testified that, although A.M. was a possible contributor of the unidentifiable DNA samples taken from the bed sheet, he could not statistically estimate the likelihood of that possibility. He said that there is no way to determine if the DNA in mixed samples were deposited simultaneously. He agreed that the life span of DNA has not been precisely determined. Greene testified that he did not specifically look for, and did not locate, any pubic hair or other materials on the evidence. He said that the semen found in the underwear was located on the inside rear of the crotch area of the panties. He reiterated that he was unable to obtain enough cellular material for a sufficiently identifiable DNA profile because the semen found in the underwear was insufficient, either in the quantity or the

quality of the sample. Greene acknowledged that his report stated that the sample found on the bed sheet contained the DNA of "two or more individuals," and not "three individuals." He admitted that the other contributors could have been anyone who had access to the bed sheet.

Julie Rosof-Williams testified that she is a nurse practitioner employed by Vanderbilt University and has worked at the Our Kids Clinic in Nashville for thirteen years. She explained that Our Kids Clinic evaluates children alleged to be victims of sexual abuse. Rosof-Williams said that she conducted a medical examination of A.M. on August 6, 2002. She explained that, in her evaluation, she relies on a patient's medical history, and she said that Lisa Dupree, a clinical social worker who is trained in interviewing children, took A.M.'s medical history at the clinic. Included in this medical history is an account of A.M.'s allegations of rape by the Defendant. According to the report, A.M. stated that she went to the Defendant's house to get a dress back from his wife. A.M. reported that "she was going up the steps, and she felt [the Defendant] behind her, touching her on her butt." A.M. said that the Defendant forced her onto the bed, touched her chest and removed her clothes. Additionally, the report states, "[A.M.] describes that [the Defendant] put his penis in her vagina. She reports that the contact was painful, but she did not see any bleeding. [A.M.] stated that he did not put anything on his penis, and she does not think he ejaculated."

Rosof-Williams testified that her examination of A.M. revealed a bruise on A.M.'s hymenal tissue. She said that the location of the bruise was consistent with injury to the genital area and penetration, and the reddish-purple color of the bruise indicated that it occurred within the preceding 72 hours. Additionally, Rosof-Williams observed that, on slides made during the exam, A.M. had "an abrasion to her fossa navicularis, a structure inside the genital opening but external to the hymenal surface," which also appeared to have occurred within the preceding 72 hours. She explained that the abrasion could have been caused by sexual contact, a self-inflicted injury, or an iatrogenic injury, caused by the examination. Based on A.M.'s reported medical history, Rosof-Williams concluded that the injury was caused by sexual penetration, but she could not be certain. She testified that she did not find any sperm present in the vagina, but she was unable to ascertain the presence of semen.

On cross-examination, Rosof-Williams explained that the bruise on the hymenal tissue was not large, but she explained the hymenal area is small, and the bruise was larger than a pinpoint bruise. She said that she could not determine whether the abrasion to the fossa navicularis area was caused by consensual or non-consensual sexual contact. She did not observe any visible signs of force or violence. Rosof-Williams explained that the fossa navicularis is a delicate area, and the abrasion to that area could have resulted from A.M. scratching the area. She further explained that the abrasion could have been an iatrogenic injury, or an injury caused during the examination itself. She admitted that she would generally expect to see more injury to the genital region following the rape of a thirteen year old girl by an adult man, but she explained that the degree of injury would vary from one person to the next depending on vaginal secretions, hymenal tissue elasticity, and various other factors. Rosof-Williams said that it was possible to cause a hymenal bruise, like that observed on A.M., during a gynecological exam, but she explained that she did not do anything during her examination of A.M. that would cause that kind of injury. She did not observe any

5

external evidence of semen during her examination.

Deputy David Crim, a deputy with the Rutherford County Sheriff's Department, testified that he was the first officer to arrive at A.M.'s house. He recalled that, when he arrived, A.M. was "whimpering and crying," and, when he entered the house, "she collapsed onto the floor and began to scream and cry . . . ." He said that he calmed A.M. enough to question her about the incident, but he said that she continued to be upset, and he had to ask questions and "draw the information out of her." Deputy Crim recalled that A.M. told him that she went upstairs in the Defendant's house, and the Defendant grabbed her from behind and forced her into a bedroom or living room. He said that A.M. stated that the Defendant had sexually assaulted her, and, upon further questioning, she told the deputy that the Defendant had raped her.

## II. The Defendant's Videotaped Statement

At the beginning of the Defendant's trial, in a jury out conference, the State and the defense announced an agreement by which certain portions of the videotaped statements, from the victim and the Defendant, would not be admitted into evidence. Both parties agreed that the videotapes should be redacted to exclude any evidence of whether the Defendant took a lie detector test and to exclude the Defendant's statements about the victim's character. Although defense counsel had not seen the redacted videotapes, the State confirmed that the agreed portions had been deleted.

Preceding one of the multiple breaks caused by editing the videotape, the statement "Would you be willing to take a lie de…" is audible. At another point in the videotape, the tape is spliced in such a way that the editing created a sound anomaly that sounds as if the Defendant states, "She is known to be a whore." Between the words "she is known to be a" and what sounds like the word "whore," the videotape "skips," and the Defendant changes his physical position.

After the Defendant's videotaped statement was played for the jury, the Defendant's counsel asked for a break in the proceedings, which the trial court granted, after allowing the State "one or two more questions." During the recess, in a jury out conference, the defense requested a mistrial based on the audible statement, "Would you be willing to take a lie de . . . ." When the trial court denied the Defendant's motion for a mistrial, the following exchange took place:

> The Court: Because lie detector, if it was done that way, listen I'm not going to allow a mistrial because y'all have agreed that this was redacted . . . correctly. . . . And I heard lie, but I didn't hear detector. And I don't know that any juror – I think that if I call their attention to it and say that you may have heard --
>
> [Defense Counsel]: Will cause more harm than good.
>
> The Court: Yes, will cause more harm. Because the lie detector test is not admissible, and I don't think we need to get into the reasons for it not being admissible.

6

[Defense Counsel]: No.

The Court: Even if he'd asked him about it, we don't tell them he did take it, we don't tell them he didn't take it. So I don't see how there's any harm there.

. . . .

[Defense Counsel]: . . . Well, I would just as soon the Court not even bring that part up because I don't want it to stick out in their minds.

The trial court acknowledged that jurors sometimes speculate even though they are not allowed to do so, but the court ultimately determined that the statement did not warrant a mistrial, because, there was neither evidence whether the Defendant took a lie detector test, nor evidence of the results of such a test.

The Defendant also requested a curative instruction regarding the anomaly that sounded like the word "whore." Defense counsel specifically requested that the trial court not mention the word "whore" in its instruction. Following the jury out conference, the trial court instructed the jury as follows:

Ladies and Gentlemen, you all have just seen the statement of [the Defendant]. And to save time, I had some of the lengthy part of that excluded, not to keep you all from hearing it, but just to save some time because it was much longer than what it appeared to be.

But at times when the splice was made – we didn't have the type of equipment that we could zero in and get it off – there were some things said that really sounded like something else. So don't be concerned about anything that you think you might have heard, especially if it was at a time when the machine was cut off and started again, when it was spliced, so to speak.

The jury convicted the Defendant of aggravated rape, and the Defendant subsequently made a motion for a new trial, asserting that the evidence was insufficient to support the conviction. The trial court denied the defendant's motion for a new trial, finding that the physical evidence, combined with the A.M.'s testimony as a "very credible witness," was sufficient evidence to support the Defendant's conviction for aggravated rape.

### III. Analysis

On appeal, the Defendant contends that: (1) the trial court erred when it failed to grant the Defendant's motion for a mistrial when inadmissible evidence was admitted through an inadequate redaction of a videotaped statement; (2) the trial court erred when it failed to provide an adequate limiting instruction to the jury regarding a videotape sound malfunction; (3) the trial court erred

when it failed to require the State to elect the offense upon which it sought conviction; (4) the trial court erred when it failed to grant the Defendant's motion for judgment of acquittal; and (5) the evidence is insufficient to sustain the Defendant's conviction.

## A. Failure to Order Mistrial

The Defendant contends that the trial court erred when it failed to order a mistrial because the videotape of the Defendant's police interview was not adequately redacted. Specifically, the Defendant asserts that the videotape played for the jury contains a question by the police, "Would you be willing to take a lie de . . .", which, the Defendant asserts, presents inadmissible evidence, both by agreement and under the Tennessee Rules of Evidence, and was, therefore, grounds for a mistrial.[2] The State counters that the Defendant has waived this issue by failing to raise it in his motion for a new trial, and, alternatively, the trial court properly denied the Defendant's motion for a mistrial.

Initially we note that the Defendant has waived this issue by failing to raise it in his motion for a new trial. See Tenn. R. App. P. 3(e). The Tennessee Rules of Appellate Procedure provide that a ground upon which a new trial is sought which was not raised in a motion for new trial will be treated as waived on appeal. Tenn. R. App. P. 3(e). However, were this issue not waived, the Defendant is still not entitled to relief.

"Tennessee courts have held repeatedly that polygraph test results, testimony concerning such results, and testimony concerning a defendant's willingness or refusal to submit to a polygraph test are inadmissible." See State v. Damron, 151 S.W.3d 510, 515 (Tenn. 2004) (citing State v. Pierce, 138 S.W.3d 820, 826 (Tenn. 2004)). Polygraph evidence is not considered reliable, and, therefore, it is irrelevant under Tennessee Rule of Evidence 402. Id. "Therefore, polygraph evidence, which includes polygraph test results, testimony concerning such results, and testimony concerning a defendant's willingness or refusal to submit to a polygraph test, is not admissible." Id. at 516.

The determination of whether to grant a mistrial rests within the sound discretion of the trial court. State v. Smith, 871 S.W.2d 667, 672 (Tenn. 1994). The reviewing court should not overturn that decision absent an abuse of discretion. State v. Reid, 91 S.W.3d 247, 279 (Tenn. 2002). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). A trial court should grant a mistrial only when it is of "manifest necessity." Id.; Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). "In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did." State v. Land, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000) (citing State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994)). The burden of establishing the necessity for mistrial lies with the party seeking it. Williams, 929 S.W.2d at 388. No abstract formula should be mechanically

---

[2] We note that the lie detection test was not a polygraph, but a voice stress analysis test. However, for the purposes of our review and analysis in this case, the type of test is not at issue.

applied in making this determination, and all circumstances should be taken into account. State v. Mounce, 859 S.W.2d 319, 322 (Tenn. 1993).

In the case under submission, the jury heard a partial statement that could indicate that the police asked the Defendant if he was willing to take a lie detector test. There was no indication of the Defendant's answer, or the results of any such test. Additionally, it appears from the record that the trial court was willing to give the jury a curative instruction on this matter, and the Defendant declined. The trial court did instruct the jury, as discussed below, to ignore anything the jury "think[s] they heard" where the tape was edited, and we conclude that this instruction would have helped prevent the jury's possible speculation. Additionally, although, as the Defendant correctly asserts, the case largely hinged on the comparable credibility of the Defendant and A.M., it was not entirely a case of "he said, she said." The Defendant's DNA matched the DNA from semen found on the Defendant's bed sheet, approximately in the location where A.M. testified that the rape occurred. DNA from an additional person was found mixed with the Defendant's DNA, and A.M. could not be excluded as the contributor of this DNA. Although the donor was unidentifiable, semen was found in A.M.'s underwear, and A.M. had a bruise on her hymenal tissue that was consistent with sexual penetration. Under these aforementioned circumstances, we cannot conclude that the trial court abused its discretion when it concluded that the partial statement heard by the jury created the "manifest necessity" for a mistrial.

## B. Adequacy of Limiting Instruction

Next, the Defendant contends that the trial court erred by giving an inadequate limiting instruction to the jury regarding a sound anomaly on the videotape of the Defendant's police interview. Specifically, the Defendant asserts that the videotape splicing and editing caused the creation of an anomaly that sounded as if the Defendant called the victim a "whore," and the trial court's subsequent instruction to the jury did not adequately address this anomaly. Further, the Defendant contends that the anomaly produced constitutes gross negligence by the State, and, as such, is analogous to prosecutorial misconduct, thereby requiring the trial court to grant a mistrial. The State counters that the Defendant has waived this issue by failing to raise it in his motion for a new trial, and, alternatively, the trial court provided an adequate curative instruction to the jury.

Again, we note that the Defendant has waived this issue by failing to raise it in his motion for a new trial. See Tenn. R. App. P. 3(e). However, were this issue not waived, the Defendant is still not entitled to relief.

We conclude that the trial court's instruction adequately addressed the sound anomaly on the videotape. The Defendant requested an instruction that addressed the anomaly without using the word "whore" or drawing unnecessary attention to the anomaly. The trial court explained that the tape's edits and splices created sounds that "may have sounded like something else." The trial court instructed the jury to ignore anything they thought they "might have heard." Thus, the trial court instructed the jury, as the Defendant requested, that the Defendant did not say what it sounded like he said, and the trial court did so without repeating the epithet or focusing undue attention on it. The

jury is presumed to follow the trial court's instructions. State v. Walker, 910 S.W.2d 381, 397 (Tenn. 1995). Accordingly, we conclude that the trial court's instruction was adequate.

## C. Election of Offenses

The Defendant next contends that the trial court erred when it failed to require the State to elect the offense upon which it sought conviction. The Defendant asserts that the digital and penile penetrations were two separate offenses, and the State was required to elect one of these offenses upon which to seek a conviction for aggravated rape.[3] The State counters that the trial court did not err because the two forms of penetration constituted one criminal offense, and, as such, the unanimity of the verdict cannot reasonably be questioned.

The Tennessee Supreme Court "has consistently held that the prosecution must elect the facts upon which it is relying to establish the charged offense if evidence is introduced at trial indicating that the defendant has committed multiple offenses against the victim." State v. Johnson, 53 S.W.3d 628, 630 (Tenn. 2001) (citing State v. Kendrick, 38 S.W.3d 566, 568 (Tenn. 2001); State v. Brown, 992 S.W.2d 389, 391 (Tenn. 1999); State v. Walton, 958 S.W.2d 724, 727 (Tenn. 1997); Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996); State v. Shelton, 851 S.W.2d 134, 137 (Tenn. 1993)). A jury's verdict is not unanimous when the jurors find the same elements of a particular crime based on different facts and offenses; the jurors must "deliberate and render a verdict based on the same evidence." See Johnson, 53 S.W.3d at 631.

"There should be no question that the unanimity of twelve jurors is required in criminal cases under our state constitution." State v. Brown, 823 S.W.2d 576, 583 (Tenn. Crim. App. 1991). The Tennessee Supreme Court explained that "'[a] defendant's right to a unanimous jury before conviction requires the trial court to take precautions to ensure that the jury deliberates over the particular charged offense, instead of creating a "patchwork verdict" based on different offenses in evidence.'" Kendrick, 38 S.W.3d at 568 (quoting Shelton, 851 S.W.2d at 137). The requirement of election and a jury unanimity instruction exists even though the defendant has not requested them. Burlison v. State, 501 S.W.2d 801, 804 (Tenn. 1973). Failure to elect offenses when the proof so requires constitutes plain error and will result in a reversal of the conviction, unless it is harmless beyond a reasonable doubt. See State v. Adams, 24 S.W.3d 289, 294 (Tenn. 2000).

In the context of aggravated rape, "sexual penetration" is defined as "sexual intercourse,

---

[3]Following the close of proof, the following exchange took place with regard to an election of offenses:

> **[The State]**: Your Honor, I'm not sure if we need to make an election since there were two types of penetration.
> **The Court:** I don't think you have to. All you have to do is penetrate. It doesn't say how or what you penetrate with.
> **[Defense Counsel]**: And it's only a one count indictment, so I don't think it's an issue.

cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of an object into the genital or anal openings of the victim's, the defendant's, or any other person's body." Tenn. Code. Ann. § 39-13-501(7) (2003). Although "each act of intercourse constitutes a distinct and separate offense," rape may be a continuous offense if the "separate acts of intercourse are so closely related as to constitute one criminal offense." State v. Phillips, 924 S.W.2d 662, 664 (Tenn. 1996). When determining if separate sexual penetrations constitute a singular offense, our Supreme Court suggested consideration of the following five factors: (1) the nature of the act; (2) the area of the victim's body invaded; (3) the time elapsed between the acts; (4) the defendant's intent; and (5) the cumulative punishment. Id.

In State v. Adrian Arnett, No. 03C01-9811-CR-00395, 2000 WL 122222, at *7 (Tenn. Crim. App., at Knoxville, Feb. 2, 2000), *aff'd on other grounds* 49 S.W.3d 250 (Tenn. 2001), this Court used the factors suggested in Phillips and held that a digital and a penile penetration could be one criminal offense. In Arnett, after the Defendant unsuccessfully attempted penile penetration, "[h]e used his finger, and then he tried again and put his penis inside of [the victim] then." Arnett, 2000 WL 122222, at *7. In concluding that the digital and penile penetrations were so closely related that they constituted a single continuous offense, this Court found that both penetrations were to the same area, only seconds apart, and the digital penetration was merely to facilitate the penile penetration. Thus, this Court concluded, the second penetration did not result from a "newly formed intent." Id.

Similarly, in the case under submission, both penetrations, digital and penile, invaded the same area of the victim's body. Further, the victim's testimony here, like the testimony in Arnett, indicates that the digital penetration was brief, and immediately followed by penile penetration. Moreover, like in Arnett, there is no evidence that the penile penetration was the result of a "newly formed intent to seek sexual gratification or inflict abuse." Id.; Phillips, 924 S.W.2d at 665. Thus, we conclude that the Defendant's digital penetration of the victim was the means to an end, a facilitation of the intended penile penetration. Accordingly, we find that an election of offenses was not required in this case.

### D. Judgment of Acquittal and Sufficiency of the Evidence

In his final two contentions, the Defendant asserts that the trial court erred when it failed to grant the Defendant's motion for judgment of acquittal, and that the evidence is insufficient to sustain his conviction. Specifically, the Defendant asserts that the victim's testimony is not credible and there is insufficient evidence of bodily harm. The State counters that the trial court did not err, and the evidence is legally sufficient to support the Defendant's convictions. As these two issues are materially the same, we will address them both as one.

When a trial court considers a motion for judgment of acquittal, its sole inquiry is whether the convicting evidence is legally sufficient. State v. Adams, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995). The court may not weigh the evidence in reaching its determination. Id. An appellate court must apply this same standard when reviewing the denial of a motion for judgment of acquittal. Id.

11

When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

"Aggravated rape is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim [where] . . . the defendant causes bodily injury to the victim . . . ." Tenn. Code Ann. §§ 39-13-502(a)(2). "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7). Thus, to support a conviction for aggravated rape, the State was required to prove that the Defendant unlawfully sexually penetrated A.M., that the Defendant's actions caused bodily injury to A.M., and that the Defendant acted intentionally, willfully, or recklessly.

Viewing the evidence in the light most favorable to the State, and allowing all reasonable inferences in its favor, the evidence is sufficient to support the Defendant's conviction for aggravated rape. The evidence showed that the Defendant, an adult male, was the victim's neighbor and the father of the victim's sibling's playmates. A.M. went into the Defendant's house, with his permission, to retrieve an article of clothing she lent to the Defendant's wife, and the Defendant then picked her up, placed her on the bed and began to touch her chest. The Defendant then removed the victim's clothes and penetrated her vagina, first digitally, then with his penis. Semen was found inside A.M.'s underwear. The Defendant's DNA was matched to DNA taken from semen found on the Defendant's bed sheet, approximately in the location where the victim said the rape occurred. Although the Defendant claims that A.M.'s testimony is not credible, the credibility of witnesses, and the weight and value of evidence, is within the province of the jury. See Liakas, 286 S.W.2d at 859. There was evidence that A.M. suffered bodily injury as a result of the sexual penetration. A.M.

testified that both the digital penetration and the penile penetration "hurt," and she said "ow." There was a bruise on A.M.'s hymenal tissue, which is consistent with sexual penetration. Further, A.M. had a laceration in her genital area that could have been caused by sexual contact.

We cannot say that, based on this evidence, a rational jury could not find the essential elements of the charged offense beyond a reasonable doubt. Accordingly, we conclude that the trial court properly denied the Defendant's motion for judgment of acquittal and that the evidence is sufficient to sustain the Defendant's conviction for aggravated rape.

## IV. Conclusion

In accordance with the foregoing reasoning and authorities, the judgment of the trial court is affirmed.

_____
ROBERT W. WEDEMEYER, JUDGE